## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

CVS PHARMACY, INC.

   Plaintiff,

v.           CIVIL ACTION NO. 2021-

SAMANTHA MARSACK AND   Hon.
HOME CARE SERVICES, INC. d/b/a
KABAFUSION

   Defendants.

_____

Michael L. Rosen
BBO No. 559954
Allison A. Anderson
BBO No. 687662
Mary K. Sexton
BBO No. 703926
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
Telephone:  617-832-1000
Email:  mrosen@foleyhoag.com
    alanderson@foleyhoag.com
    msexton@foleyhoag.com

Richard W. Warren (P63123)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson, Suite 250
Detroit, MI  48226
Telephone:  313-963-6420
Email:  warren@millercanfield.com

ATTORNEYS FOR CVS PHARMACY, INC.
_____

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u>

Plaintiff CVS Pharmacy, Inc. ("CVS") files this Verified Complaint against Defendants Samantha Marsack ("Marsack") and Home Care Services, Inc. d/b/a KabaFusion ("KabaFusion") (collectively, "Defendants"), and alleges as follows:

## <u>INTRODUCTION</u>

CVS brings this action to enforce a restrictive covenant agreement against its former employee, Marsack, and her new employer, KabaFusion.  CVS employed Marsack at its infusion services business, Coram.  Coram provides at-home infusion services for patients transitioning from a healthcare setting to a home setting. Marsack was employed as a Clinical Services Liaison at Coram, which is a sales position.  In this role, Marsack was responsible for servicing a small number of hospital accounts in the greater Detroit area.  Her largest account was a group of hospitals in the Beaumont Health System.  Marsack called on dozens of providers at the Beaumont hospitals multiple times every week, growing Coram's business in these accounts and developing valuable relationships on behalf of Coram.  Coram aided Marsack in her job by providing her with access to sensitive business information about its clients, sources of referral business, strategies and business operations.

As a condition of her employment, Marsack signed a Restrictive Covenant Agreement (the "Agreement") containing, among other things, a one-year post-

employment customer non-solicitation provision and prohibitions against using CVS/Coram's confidential information for purposes other than in the performance of her job.

In March 2021, Marsack resigned from Coram. At the time, she refused to identify her new employer.  Three months later, in June 2021, Coram learned that Marsack had accepted a Clinical Liaison position in the greater Detroit area with its direct competitor, KabaFusion. CVS contacted Marsack and KabaFusion, expressing concern about her new role and her continuing obligations to CVS under the Agreement.  KabaFusion assured CVS that Marsack would not be calling on the Beaumont Health System, or other Coram clients.  CVS accepted KabaFusion's representations.

On October 15, 2021, a Coram employee saw Marsack firsthand at the Dearborn Beaumont Hospital – one of the largest clients she serviced during her Coram employment and one of the accounts she and KabaFusion committed she would not service the duration of her non-solicitation restriction  – handing out her KabaFusion business card to a Coram customer. She did so openly, and without any apparent concern that she was acting in direct violation of the Agreement.

Marsack's breach of the Agreement and KabaFusion's interference with the same are causing immediate and irreparable injury to CVS and depriving CVS of valuable business opportunities.

For these reasons, and those described fully below, CVS seeks immediate injunctive relief to enjoin Defendants' unlawful conduct.

## PARTIES

1.      CVS is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS is a corporate parent of Coram Specialty Infusion Services, L.L.C., a Delaware limited liability company with its principal place of business in Woonsocket, Rhode Island.

2.      Marsack is an individual residing, on information and belief, in Macomb, Michigan.  Until her resignation effective March 27, 2021, Marsack was a Clinical Services Liaison at Coram.

3.      Home Care Services, Inc. d/b/a KabaFusion is a New Jersey corporation with its principal place of business in California. Upon information and belief, KabaFusion is Marsack's current employer.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (c) because Defendants reside and/or or conduct business in the Eastern District of

Michigan, and because a substantial part of the events or omissions giving rise to the claims for relief occurred in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

6.      CVS consists of, among other businesses, a retail pharmacy business and a specialty pharmacy business.

7.      One of its specialty pharmacy businesses is operated through Coram.

8.      Coram is a leading provider of home infusion and tube feeding therapy for patients nationwide.  Coram works with providers in various healthcare settings (*e.g.,* hospitals and physician offices) to facilitate the safe discharge of patients from a healthcare setting to a home setting, where that patient can safely receive infusion services from Coram at home.

9.      Coram's patients have various infusion needs. For instance, it works with patients who have infections that require intravenous medication, rather than oral medication, and patients with congestive heart failure taking intravenous medications to maintain their quality of life. Coram also routinely provides infusion therapies for patients who receive nutrition intravenously or through a feeding tube.

10.      While Coram delivers its infusion services to patients in a home setting (or a Coram office, where a home setting is not available), its business is generated, for the most part, at healthcare facilities.

11.     Specifically, Coram earns most of its business through referrals from care teams at hospitals or physician offices.  For example, a clinician at a hospital may be treating a patient that needs ongoing infusion services that can be provided at the patient's home, rather than at the hospital.  In this case, the clinician will ask the patient's case manager (also a hospital employee) to arrange for the at-home care.  That case manager will then refer the patient to a third-party provider, like Coram, for these services.

12.     Once Coram receives a referral, it then works with the clinician, the case manager and the patient to facilitate the patient's safe discharge from the hospital.  This includes Coram compounding and delivering the patient's medications (which Coram provides through its specialty pharmacy), educating the patient at his/her bedside about what to expect when the patient receives care at home, and managing insurance and/or payer matters or other issues related to arranging the at-home care. Once the patient is at home, Coram provides ongoing nursing services to the patient for the infusion services.

13.     Coram has a highly skilled, medically-trained sales team responsible for winning referrals from healthcare providers for patient care.  Under its business model, the healthcare provider is Coram's target customer, and the patient is the user of its services.

14.     Coram provides its services nationwide, and its sales teams are organized by regional territories.  Relevant here is Coram's Great Lakes Region, which include Eastern Michigan, where Defendants Marsack and KabaFusion also are engaged in business.

15.     Coram's Great Lakes Region includes eight states. Five Regional Sales Managers (RSM) oversee this territory. The RSM is responsible for hiring new sales employees, providing training to their sales teams, and managing the sales employees across their region to find and develop new business opportunities. The RSM routinely holds meetings with their sales teams discussing proprietary company strategies, key initiatives and growth opportunities. Other proprietary information such as contracting, pricing, and business prospects are discussed in these meetings as well.

16.     Reporting to the RSMs are Territory Managers (TM) and Clinical Services Liaisons (CSL).  Both TMs and CSLs have medical certifications, such as nursing degrees.

17.     TMs are responsible for identifying new business opportunities across a larger territory, and from a variety of sources.  For instance, they may look for new business from various physician offices, skilled nursing facilities, and other providers.

18.     CSLs are responsible for sales at a small number of high opportunity accounts, usually hospitals, by calling on providers at the assigned hospitals to obtain referrals for patients needing at-home infusion care.

19.     Typically, in the hospital setting, the providers making at-home infusion referrals are either Case Managers (CMs) or Post-Acute Care Coordinators (PACCs).  Generally, CMs or PACCs can refer patients to whichever at-home infusion provider they prefer.  In other words, hospitals do not require a particular at-home infusion provider be used.

20.     Consequently, a CSL is in regular and continuous contact with the CMs and PACCs to sell Coram's services, so that the CM or PACC will refer patients to Coram, rather than one of its competitors.

<u>Marsack's Role at Coram</u>

21.     Marsack began working for Coram as a CSL in or around January 2021.  Her responsibilities included those described in Paragraphs 18-20, above.

22.     Marsack's territory included between ten and thirteen hospital accounts in the Eastern Michigan area.  Her largest account was a group of hospitals that are part of the Beaumont Health System.

23.     Specifically, Marsack was assigned to the following Beaumont Hospitals: Dearborn, Grosse Point, Taylor, Trenton and Wayne.

24.     Marsack had about thirty-five high priority contacts at the Beaumont hospitals, which were mostly CMs and PACCs.  Marsack was expected to and did call on these contacts multiple times per week. Additionally, Marsack called on CM/PACC management, dieticians and physicians in the Beaumont system, where she further developed Coram relationships and referral sources.

25.     In addition to Beaumont hospitals, Marsack was also responsible for sales at other Eastern Michigan area hospitals.

26.     Marsack participated in regular, usually weekly, calls with her TM and RSM, where she received Coram confidential information related to contracting, pricing, customers, business and marketing strategies, and prospective business opportunities. Coram also provided Marsack proprietary sales materials to use to solicit new business.

<u>Marsack's Restrictive Covenant Agreement</u>

27.     As a condition of her employment, Marsack entered into the Agreement on or about January 28, 2020.  <u>Exhibit A.</u>  Her hire and ongoing employment, among others things, were the consideration for entering into the Agreement and complying with its terms.

28.     At Section 3 of the Agreement, Marsack agreed that for a period of 12 months following her termination she would not "interfere with the Corporation's relationship with its Business Partners by soliciting or communicating (regardless

of who initiates the communication) with a Business Partner to: (i) induce or encourage the Business Partner to stop doing business or reduce its business with the Corporation, or (ii) buy a product or service that competes with a product or service offered by the Corporation's business." Id.

29.     Business Partner is defined in the Agreement as "a customer (person or entity), a prospective customer (person or entity), healthcare provider…hospital, hospital system... and/or pharmaceutical manufacturer with whom the Corporation has a business relationship and with which [the employee] had business-related contact or dealings, or about which [the employee] received Confidential Information, in the two year prior to" the employee's termination from CVS.  Id.

30.     Section 4 of the Agreement prohibits Marsack from disclosing "any of the Company's Confidential Information," which expressly includes non-public information such as:

> trade secrets; computer code generated or developed by the Corporation; software or programs and related documentation; strategic compilations and analysis; strategic compilations and analyses; strategic processes; business or financial methods, practices and plans; non-public costs and prices; operating margins; marketing, merchandising and selling techniques and information; customer lists; provider lists; details of customer agreements; pricing arrangements with pharmaceutical manufacturers, distributers or suppliers including but not limited to any discounts and/or rebates; pricing arrangements with insurance clients and customers; pharmacy reimbursement rates; premium information; payment rates; contractual forms; expansion strategies; real estate strategies; operating strategies; sources of supply; patient records; business plans; other financial, commercial, business or technical information related to the Corporation and

confidential information of third parties which is given to the Corporation
pursuant to an agreement to keep such information confidential.

Id.

31.     At Section 9 of the Agreement, Marsack agreed that a breach of the

Agreement "would cause irreparable damage to the Corporation, and in the event

of such breach the Corporation shall have… the right to an injunction…." Id.

Marsack's Resignation and Acceptance of<br>Employment at Coram's Competitor, KabaFusion

32.     On or about March 15, 2021, Marsack emailed her supervisor,

Regional Sales Manager, Cheri Hays, to inform Hays that Marsack was resigning

effective March 26, 2021.  Marsack did not reveal in her email whether she had

accepted a new position with another company.

33.     Hays contacted Marsack by telephone soon after receiving Marsack's

email.  Hays expressed her disappointment that Marsack was leaving, as she

considered Marsack a great employee.  Hays reminded Marsack of her obligations

under the Agreement during their conversation, yet Marsack still did not reveal

whether she had accepted a position at another company.

34.     In or around June 2021, CVS learned that Marsack had, in fact,

accepted a position with one of its competitors, KabaFusion.

35.     Like Coram, KabaFusion provides at-home infusion services to

patients transitioning from the hospital to their homes.

36.     Upon information and belief, KabaFusion was founded in 2010 and is one of the largest at-home infusion providers in the United States.

37.     Upon information and belief, in or around March 2020, KabaFusion acquired Lincare Infusion, a company that had held substantial market share for home infusion services in East Michigan, among other areas.  In particular, Lincare Infusion, and now KabaFusion, is a leading provider for at-home infusion services referred from the Detroit Medical Center health system.

38.     However, upon information and belief, KabaFusion has made little, if any, headway in winning referrals from the Beaumont Health System, where Coram currently has significant market share.

39.     Upon learning that Marsack had accepted a position at KabaFusion, on around June 7, 2021, CVS sent Marsack and KabaFusion letters describing Marsack's continuing obligations to CVS and its concern that she was violating her Agreement.  Exhibit A (CVS letter to Marsack); Exhibit B (CVS letter to KabaFusion).[1]

40.     On or around June 15, 2021, KabaFusion replied to CVS.  It confirmed that Marsack began working as a Clinical Liaison for KabaFusion based out of its Livonia, Michigan office on March 29, 2021.  KabaFusion described her

---

[1] CVS has redacted the name of an individual referenced in the correspondence at Exhibits A-C, as that person's involvement is not germane to this dispute.

role as one where she "collaborates with our pharmacy to facilitate the referral process in planning patients in alternative sites for infusion services." <u>Exhibit C.</u>

41.    KabaFusion also represented that Marsack's "scope of employment with KabaFusion extends to patients in the Children's Hospital of Michigan and Karmanos Hospital network. **KabaFusion understands that Ms. Marsack's scope of employment with Coram/CVS extended to patients within the Beaumont Health System**…. Ms. Marsack's role with KabaFusion will not infringe upon Coram's business interests. **Ms. Marsack will not be engaging in the same business as she did with Coram nor shall she engage with the same clients**." <u>Exhibit C</u> at Section 1 (emphasis added).

<u>Marsack Violates the Agreement on Behalf of KabaFusion</u>

42.    In May 2021, Coram hired Nicole Marulli to replace Marsack in the CSL role in its East Michigan territory.

43.    Marulli was assigned to nearly all of Marsack's accounts, including most of the Beaumont Health System.

44.    On or around October 15, 2021, Marulli was on site at Beaumont Dearborn Hospital when she observed Marsack on the 6th floor handing out Marsack's business card to a PACC on behalf of KabaFusion.

45.    Specifically, Marulli was standing with a CM and PACC working on a referral for a particular patient.  The CM saw Marsack, called her over and made

a comment that Marsack used to have Marulli's job with Coram. This was the first time that Marulli met Marsack.

46.     Marsack introduced herself to Marulli. She then handed the PACC her KabaFusion business card.  The CM told Marsack that she should connect with other case managers as well. Marsack then walked away.

47.     For context, the 6th floor of Dearborn Hospital, where Marsack was observed working on behalf of KabaFusion, is the medical surgical floor.  Many of Coram's referrals at Dearborn come from patients receiving care on the 6th floor. Marsack undoubtedly knew this from her recent time developing Coram's relationships with the CMs and PACCs at this hospital.  In fact, Marsack also knew that patients needing total parenteral nutrition (TPN) are usually treated on the 6th Floor of Dearborn, and that TPN infusion care is one of the highest revenue generating referrals a CSL can get.

48.     Marsack's solicitations at Dearborn on October 15 was in direct violation of the Agreement and KabaFusion's representations that Marsack would not be working in the Beaumont Health System or engaging with clients whom she dealt with on behalf of Coram.

49.     Upon information and belief, Marsack has been and continues to solicit Coram's Business Partners in violation of her Agreement, and KabaFusion knows, or has reason to know, that she has been doing so on its behalf.

50.     Marsack's and KabaFusion's actions have caused and will cause compensatory and non-compensable damage to Coram's business and goodwill, which are invaluable assets in this competitive industry.  Indeed, Coram has developed at great effort and expense its relationships with healthcare providers so that it will be their first choice for referring patients for at-home infusion services. By capitalizing on Coram's good will, Marsack's solicitations on behalf of KabaFusion have caused and continue to cause Coram immediate and irreparable harm.

51.     Further, because the non-solicitation restriction is limited to one-year and tailored to cover only those Businesss Partners with whom she has dealt or about whom she received confidential information, the non-solicitation provision is narrowly tailored to protect CVS's good will and confidential information.

## COUNT I- BREACH OF CONTRACT

(Defendant Marsack)

52.     CVS adopts and incorporates all of its preceding allegations as if fully set forth herein.

53.     Marsack's Agreement is a valid and enforceable contract.

54.     The non-solicitation and non-disclosure of confidential information provisions in Marsack's Agreement are reasonable, valid, and tailored to

reasonably protect CVS's legitimate business interests, including its confidential business information as well as its valuable client relationships.

55.     The provisions of Marsack's Agreement are also designed to protect the significant investments CVS has made in its business operations, marketing efforts, and in its relationships with both its current and prospective Business Partners.

56.     CVS has performed each and every obligation and condition required of it pursuant to Marsack's Agreement.

57.     On information and belief, Marsack has solicited at least one CVS customer on behalf of KabaFusion.  Marsack was seen actively engaging in marketing and sales efforts at a hospital that she had actual knowledge was a current CVS customer regarding services in which KabaFusion is a direct CVS competitor.

58.     Marsack has failed to perform her obligations under her Agreement, and therefore has materially breached the terms and conditions of her Agreement. Specifically, Marsack has breached Sections 3 and 4 of her Agreement.

59.     CVS has suffered and will continue to suffer actual and threatened injuries as a direct result of Marsack's breaches, including, without limitation, the loss of its confidential and proprietary information, trade secrets, clients, business reputation, market share, profits, and goodwill.

## COUNT II - TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

(Defendant KabaFusion)

60.     CVS adopts and incorporates all of its preceding allegations as if fully set forth herein.

61.     Marsack's Agreement is a valid and enforceable contract.

62.     KabaFusion had knowledge of Marsack's contract with CVS Pharmacy, Inc. and its validity.

63.     KabaFusion has intentionally and improperly interfered with CVS's rights under the contract with Marsack by employing Marsack to market and sell its infusion services to existing and prospective CVS Business Partners.

64.     KabaFusion's interference with CVS' contractual rights is intended to do harm, is without justification, and has caused CVS to lose rights under the contract.

65.     CVS has suffered and will continue to suffer actual and threatened injuries as a direct result of KabaFusion's tortious conduct, including, without limitation, the loss of its confidential and proprietary information, trade secrets, clients, business reputation, market share, profits, and goodwill.

## COUNT III - TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

(Defendants Marsack and KabaFusion)

66.     CVS adopts and incorporates all of its preceding allegations as if fully set forth herein.

67.     CVS has a business relationship and/or expectancy of a business relationship with its Business Partners, including but not limited to providers at Dearborn Beaumont Hospital.

68.     Marsack and KabaFusion have knowledge of CVS's business relationship and/or expectancy of a business relationship with its Business Partners, including but not limited to Dearborn Beaumont Hospital.

69.     Dearborn Beaumont Hospital is a significant source of referrals for CVS' home infusion services, and CVS has a reasonable expectancy of entering into further business relationships established through its current business at Dearborn Beaumont Hospital.

70.     On information and belief, Marsack and KabaFusion intentionally interfered with CVS' business relationship by engaging in targeted marketing and sales efforts toward CVS' existing Business Partners at Dearborn Beaumont Hospital.

71.     CVS has suffered and will continue to suffer actual and threatened injuries as a direct result of Marsack and KabaFusion's tortious conduct, including, without limitation, the loss of its confidential and proprietary information, trade secrets, clients, business reputation, market share, profits, and goodwill.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, Plaintiff CVS prays for the following relief:

1.      That the Court find in favor of CVS and against both Defendants on all Counts;

2.      That the Court award CVS compensatory, consequential, and exemplary damages;

3.      That the Court enter a temporary restraining order and preliminary and permanent injunction enjoining Marsack, whether directly or indirectly, whether alone or in concert with KabaFusion or any KabaFusion representative, until further order of this Court, as follows:

> (a)      Interfering with CVS's relationships with its Business Partners (as defined by the Agreement) by soliciting or communicating (regardless of who initiates the communication) with a Business Partner to (i) induce or encourage the Business Partner to stop doing business or reduce its business with CVS, or (ii) buy a product or services that competes with a product or services offered by CVS' business.  Said restriction is limited to Business Partners with whom CVS has a business relationship and with which Marsack had business-related contact or dealing or about which she received

Confidential Information (as defined by the Agreement) in the two years prior to the termination of Marsack's employment with CVS; and

(b)     Improperly using any of CVS' Confidential Information, as defined by the Agreement.

4.     That the Court order Marsack and/or KabaFusion to pay CVS' fees and costs, including reasonable attorneys' fees; and

5.     That the Court award CVS such other and further relief, both general and special, at law or in equity, to which CVS is justly entitled.

Respectfully submitted,

/s/ Richard W. Warren (P63123)
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Plaintiffs
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420
warren@millercanfield.com

-AND-

Michael L. Rosen
BBO No. 559954
Allison A. Anderson
BBO No. 687662
Mary K. Sexton
BBO No. 703926
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
Telephone:  617-832-1000

20

Email:     mrosen@foleyhoag.com
              alanderson@foleyhoag.com
              msexton@foleyhoag.com

ATTORNEYS FOR CVS PHARMACY, INC.

## **VERIFICATION**

STATE OF _Arkansas_ )

COUNTY OF _Pike_ )


I, Cheri Hays, being duly sworn on her oath, states that I am employed as a

Regional Sales Manager for Coram, a subsidiary of CVS Pharmacy, Inc., and that I

have read the foregoing Verified Complaint for Injunctive Relief, and that the

statements contained therein are true and accurate to the best of my knowledge,

information, and belief.

_Cheri Hays_

Subscribed and sworn to before me this _22_ date of _October_ ,
2021.


_Sheena Coffman_
NOTARY PUBLIC

My Commission Expires: _February 1, 2027_



SHEENA COFFMAN
MY COMMISSION # 12358147
EXPIRES: February 1, 2027
Montgomery County

FH10251473.1